UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

VFS FINANCING, INC.,                                  :

                                    Plaintiff,        :

                                                      :

              -v-                                     :

                                                      :

ELIAS-SAVION-FOX LLC, et al.,                         :

                                    Defendants.       :

                                                      :
------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/1/2014

12 Civ. 2853 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

         Plaintiff VFS Financing, Inc. ("VFS") seeks a turnover order enabling it to reach two

assets of its debtor, defendant Richard Fox ("Fox"): an "SRA/IRA" retirement account

containing approximately $600,000 and a joint marital cash account containing approximately

$7,000.  VFS seeks this order in partial satisfaction of a $2.4 million judgment it obtained before

this Court, pursuant to a settlement with Fox and his co-defendants.  The parties dispute whether

VFS can reach either account.  The two accounts present different legal issues.  VFS's ability to

reach the retirement account primarily turns on whether the Employee Retirement Income

Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, preempts state anti-garnishment

laws that shelter such accounts from judgment creditors, whereas VFS's ability to reach the joint

marital cash account depends on whether Pennsylvania or New York law applies.

         The Court's rulings, fully explained below, are as follows.  Based on the parties' written

agreements, New York law applies to this dispute, including New York Civil Practice Law and

Rules ("CPLR") § 5205, which shields the SRA/IRA retirement account from garnishment by

creditors (save for contributions made during, or after, the 90-day window that preceded the

filing of the creditor's lawsuit).  The Court holds that ERISA does not preempt this statute.

Thus, VFS is not entitled to a turnover order with respect to Fox's retirement account, except as

to funds added after January 12, 2012, which is 90 days before VFS filed this lawsuit.  As to the

joint marital account, New York law does not protect that account from creditors, and therefore

VFS is entitled to a turnover order as to that account.

## I.    Background

### A.    The Underlying Lawsuit

The underlying lawsuit in this case involved a loan to finance a private jet.  As alleged in

VFS's Complaint, in July 2001, VFS loaned $5 million to defendant Elias-Savion-Fox LLC

(which has three members—Fox, Philip Elias, and Ronnie Savion) to enable it to purchase a

Cessna Model No. 560.  *See* Dkt. 1 ("Compl."), ¶ 9.  The loan was evidenced by a $5 million

note, which was secured by an Aircraft Security Agreement ("ASA") that granted VFS a security

interest in the Cessna aircraft.  *Id.* ¶¶ 10–11.  In connection with the loan, the three individual

defendants (Fox, Elias, and Savion) each executed an absolute and unconditional guaranty in

favor of VFS.  *Id.* ¶ 12.

In November 2007, the parties refinanced the 2001 loan (for $4.27 million) pursuant to a

new note.  *Id.* ¶ 14.  The note again gave VFS a security interest in the Cessna; Fox, Elias, and

Savion again each executed an absolute and unconditional guaranty in VFS's favor.  *Id.* ¶¶ 18–

20.  Each of "the debt documents"—the note, the ASA, and the individual guaranties—provided

that New York law would govern its interpretation, and that any dispute relating to "the debt

documents" would be resolved in a New York forum.  *Id.* Exs. A, B, C, D, E.

Under the ASA, defendants were required to maintain the Cessna in airworthy condition.

*Id.* ¶ 22.  In December 2011, defendants notified VFS that the aircraft was inoperable.  *Id.* ¶ 24.

VFS then notified the defendants that they were in breach.  *Id.* ¶ 25.  After defendants failed to cure the breach, VFS brought suit on April 11, 2012 against all four defendants—the LLC and its three members—alleging that they had defaulted and breached the debt documents.  VFS sought to recover on, *inter alia*, the note.  *Id.* ¶ 46.  A bench trial was scheduled for July 2013.  Dkt. 29.

The day before trial, VFS settled with all defendants.  Dkt. 34.  On July 9, 2013, pursuant to the settlement agreement, the Court entered a consent judgment.  The judgment entitled VFS to $2,404,606 (plus interest and attorneys' fees and costs in enforcing its judgment) from the defendants, each of whom was made jointly and severally liable.  Dkt. 35, 36, 37, 38.

### B.    VFS's Attempt to Collect on the Judgment

VFS has since attempted to collect on the judgment.  At oral argument, it represented that it has recovered approximately $200,000 by selling the Cessna jet, the one asset held by defendant Elias-Savion-Fox LLC, and has turned now to pursuing assets of the individual defendants.  *See* Oral Arg. Tr., 4–5.

On May 19, 2014, the Clerk of Court entered a Writ of Execution against Fox's property.  Dkt. 39-1, at 7–8.  On May 23, 2014, VFS faxed a copy of the writ of execution to Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch"), the brokerage firm, at which Fox holds two accounts—a retirement account containing approximately $600,000 and a joint marital bank account containing approximately $7,000.  *See id.* at 10; Oral Arg. Tr., 27.  The writ directed Merrill Lynch immediately to freeze and turn over any assets it held in Fox's name.  On June 6, 2014, the U.S. Marshals Service served the writ on Merrill Lynch.  On or about June 19, 2014, Merrill Lynch notified VFS that Merrill Lynch had frozen the two accounts, and that it would turn over the assets to VFS if VFS obtained a court order to that effect.  *See* Dkt. 39-1, at 18.

### C.      VFS's Turnover Motion

On June 30, 2014, VFS filed a turnover motion in this Court with respect to Fox's two Merrill Lynch accounts, and supporting documentation.  Dkt. 39.  On July 29, 2014, Fox filed a memorandum of law in opposition, arguing that the two accounts are protected from creditors by state law.  Dkt. 44.  Fox took the position that Pennsylvania law—which would protect both the retirement account and the joint marital account from creditors—applied.  *Id.*  On August 6, 2014, VFS filed a reply, arguing that it could reach Fox's retirement account because ERISA preempts state laws sheltering SRA/IRA retirement accounts, and that it could reach Fox's CMA account because New York (not Pennsylvania) law applies, and New York law does not protect joint marital accounts from creditors.  Dkt. 45.  On September 29, 2014, Fox moved to strike VFS's reply, or, in the alternative, for leave to file a sur-reply.  Dkt. 52.  On October 1, 2014, the Court denied the motion to strike but permitted Fox to file a sur-reply, which he did.  Dkt. 54.

The Court heard argument on October 3, 2014.  The parties agreed that the relevant facts are undisputed, *see* Oral Arg. Tr., 3, and that VFS's turnover motion turns purely on questions of law.  Argument focused on the retirement account—in particular, whether the retirement account is governed by ERISA, and, if so, whether ERISA preempts state law from sheltering an SRA/IRA retirement account from creditors.  On October 10, 2014, VFS submitted a letter responding to questions at argument.  Dkt. 55.  On October 25, 2014, Fox submitted a letter in reply.  Dkt. 59.

### D.      Nature of the Two Accounts

Fox's retirement account is a Savings Incentive Match Plan for Employees ("SIMPLE") Retirement Account/Individual Retirement Account—for short, an "SRA/IRA."  An SRA/IRA is a type of retirement account.  An SRA/IRA is available only to employers with 100 or fewer

employees.  *See* IRS Pub. 4334, "SIMPLE IRA Plans for Small Businesses" (Rev. 11-2013)

Catalog No. 38508F.  The employer sets up the SRA/IRA account and must make a contribution

when an eligible employee contributes.  *Id.*  Once the retirement account is created, the employee

has full control over the funds in the account.  Money in an SRA/IRA account appreciates tax-

free; funds in the account are taxed only upon withdrawal.  *Id.*

An employer may create an SRA/IRA program by, *inter alia*, using an IRS-approved

default form or a financial institution's approved prototype.  To create its program, Fox's

employer used a prototype, created by Merrill Lynch and approved by the Department of the

Treasury, known as the "Merrill Lynch Simple Retirement Account Program."   Dkt. 52 ("Def.

Sur-Reply"), Ex. A.  Under that program, the employer sets up the SRA/IRA; an employee is

eligible to participate—*i.e.*, to receive money in his or her SRA/IRA account—if he or she is

expected to earn at least $5,000 in compensation from the employer and earned at least that

amount from that employer in any two preceding years; if an employee participates, the

employer must make contributions (of 1%–3% of the employee's compensation for the plan

year).  *See id.*  As the parties agree, the Merrill Lynch program is governed by ERISA:  The U.S.

Department of Labor (DOL) lists "Savings Incentive Match Plans for Employees of Small

Employers (SIMPLEs)" among the retirement plans that ERISA governs.  *See* U.S. Dep't of

Labor, Employee Benefits Security Administration, *Frequently Asked Questions About*

*Retirement Plans and ERISA*, *available at*

http://www.dol.gov/ebsa/faqs/faq_compliance_pension.html (last visited December 1, 2014).

Fox's second account at Merrill Lynch is a cash management account ("CMA") held

jointly with his wife, Celine.  It can be used for savings and investment purposes.  It is not a

retirement account.  A CMA account has the benefits of a traditional checking account, in that

interest is earned on its contents; the accountholder can make deposits into and write checks upon the account.

## II.      Discussion

VFS argues that it is entitled to a turnover order with respect to both of Fox's Merrill Lynch accounts.  Fox opposes this motion on various grounds: that (1) VFS waived its right to pursue this remedy; (2) VFS failed to comply with the New York Civil Practice Law and Rules ("CPLR"); and (3) VFS's turnover application is precluded by state law.

The Court first addresses, and rejects, Fox's waiver and CPLR arguments; then resolves the parties' dispute as to whether New York or Pennsylvania law applies to this dispute, an issue that bears on VFS's turnover applications as to both accounts; and then resolves VFS's turnover claims on the merits.

### A.      Fox's Claims of Waiver and of Non-Compliance with the CPLR

Fox argues that VFS waived its right to pursue its turnover claims by failing, in its initial turnover motion, to cite supporting case law.  Def. Sur-Reply, 1.  That is wrong.  To be sure, VFS's motion was unhelpfully cursory; the Court would have benefited from more thorough briefing given the complexity of the issues, including on the issue of ERISA preemption.  But the relief Fox seeks, preclusion of VFS from seeking turnover, is disproportionate to VFS's lapse.

VFS's papers were sufficient to put Fox on notice of its turnover claim.  And VFS supplied Fox and the Court with all the factual materials needed to resolve its claim: the parties' settlement agreement (Dkt. 38), the Clerk of Court's Writ of Execution (Dkt. 39-1, at 7), the U.S. Marshals' levy on the Merrill Lynch bank accounts (Dkt. 39-1, at 16), and Merrill Lynch's statement that it would turn over Fox's assets in response to a court order (Dkt. 39-1, at 18). These documents gave Fox full notice of VFS's claim—indeed, Fox and his attorney had clear

notice as of June 30, 2014, the date VFS filed its turnover motion.  And notice to the opposing party is the crux of the waiver doctrine.  *See, e.g.*, *In re McMahon*, 236 B.R. 295, 314 (S.D.N.Y. 1999) ("Waiver is based on the principle that if one party, by his conduct, leads another to believe that the strict legal right arising under the contract will not be insisted upon, intending that the other should act on that belief, and he does so act on it, then the first party will not afterwards be allowed to insist on the strict legal rights when it would be inequitable for him to do so.") (citation and alteration omitted).

In any event, there is no harm to Fox:  The Court granted Fox leave to file a sur-reply, *see* Dkt. 54, giving Fox the opportunity to respond, at length, to all legal arguments and case citations in VFS's reply brief.  *Cf. Curry v. City of Syracuse*, 316 F.3d 324, 331 (2d Cir. 2003). And, when VFS submitted a short letter following oral argument, the Court invited Fox to submit a reply, stating that his reply would be the final word on these issues.  Dkt. 56.  For these reasons, the Court rejects Fox's waiver argument.

Fox next argues that the Court lacks jurisdiction because VFS failed to comply with New York CPLR § 5222 in the manner in which it initiated a turnover proceeding.  For two reasons, this argument, too, fails.

First, the Court has independent jurisdiction to enforce its order that Fox pay VFS more than $2.4 million.  "As a general rule, once a federal court has entered judgment, it has ancillary jurisdiction over subsequent proceedings necessary to 'vindicate its authority, and effectuate its decrees.'  This includes proceedings to enforce the judgment.  Without ancillary jurisdiction to enforce judgments, 'the judicial power would be incomplete and entirely inadequate to the purposes for which it was conferred by the Constitution.'  As a result of its entry of judgment for the plaintiff, the district court possessed ancillary jurisdiction to enforce the judgment through

supplementary proceedings." *Dulce v. Dulce*, 233 F.3d 143, 146 (2d Cir. 2000) (quoting *Peacock v. Thomas*, 516 U.S. 349, 354, 356 (1996)); *see also* 13 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Fed. Prac. & Proc.* § 3523, at 89 (2d ed. 1984) (Ancillary jurisdiction "include[s] those acts that the federal court must take in order properly to carry out its judgment on a matter as to which it has jurisdiction").  And although state law often "supplies procedures for the enforcement of a federal court judgment," compliance is procedural rather than jurisdictional.  *Dulce*, 233 F.3d at 146.  Second, as VFS shows, by the time of argument, it had fully complied with the CPLR.  *See* Dkt. 45 Ex. A.  Fox's two threshold arguments against entertaining VFS's turnover claims are, therefore, unconvincing.

### B.    Choice of Law

The Court addresses next which state's law applies to this controversy:  Pennsylvania's (as Fox argues) or New York's (as VFS argues).  The choice of law matters because the two states' laws differ as to both accounts that VFS seeks to reach.  As to the retirement account, both New York and Pennsylvania have anti-garnishment statutes that protect various types of property from creditors trying to satisfy a judgment, including certain clothing and books, and—crucially—IRA accounts (like SRA/IRA accounts) created under Internal Revenue Code (IRC) § 408.  *See* N.Y. CPLR § 5205; 42 Pa. Cons. Stat. § 8124.  But New York's excludes contributions to such accounts "made after the date that is ninety days before the interposition of the claim on which such judgment was entered," N.Y. CPLR § 5205(c)(5),[1] whereas

---

[1] New York CPLR § 5205(c) provides:

> (c) Trust exemption. 1. Except as provided in paragraphs four and five of this subdivision, all property while held in trust for a judgment debtor, where the trust has been created by, or the fund so held in trust has proceeded from, a person other than the judgment debtor, is exempt from application to the satisfaction of a money judgment.

Pennsylvania's shelters IRA accounts in their entirety.  As to the CMA account, under

Pennsylvania law, a creditor of only one spouse cannot reach an account held by both spouses as

tenants by the entirety, *see, e.g.*, *Patwardhan v. Brabant*, 439 A.2d 784, 785 (Pa. Super. 1982)

("It is well settled that entireties property is unavailable to satisfy the claims of the creditor of

one of the tenants."), whereas New York does not recognize tenancies by the entirety as to

personal property, nor does it typically protect a debtor's personal property (including a joint

bank account) from a creditor in deference to the interests of the non-debtor spouse.  *See* pp. 30–

31, *infra.*

       The Court holds that New York law applies, because the parties chose New York

substantive law to apply to this controversy, and that selection was valid under New York choice

of law principles.  The documents executed by the parties in connection with the aircraft loan all

provide that New York law is to govern their disputes.  The loan agreement, the aircraft security

---

2. For purposes of this subdivision, all trusts, custodial accounts, annuities, insurance contracts, monies, assets or interests established as part of, and all payments from, either any trust or plan, which is qualified as an individual retirement account under section four hundred eight or section four hundred eight A of the United States Internal Revenue Code of 1986,1 as amended, a Keogh (HR-10), retirement or other plan established by a corporation, which is qualified under section 401 of the United States Internal Revenue Code of 1986, as amended, or created as a result of rollovers from such plans pursuant to sections 402 (a) (5), 403 (a) (4), 408 (d) (3) or 408A of the Internal Revenue Code of 1986, as amended, or a plan that satisfies the requirements of section 457 of the Internal Revenue Code of 1986, as amended, shall be considered a trust which has been created by or which has proceeded from a person other than the judgment debtor, even though such judgment debtor is (i) in the case of an individual retirement account plan, an individual who is the settlor of and depositor to such account plan, or (ii) a self-employed individual, or (iii) a partner of the entity sponsoring the Keogh (HR-10) plan, or (iv) a shareholder of the corporation sponsoring the retirement or other plan or (v) a participant in a section 457 plan.
…
5. Additions to an asset described in paragraph two of this subdivision shall not be exempt from application to the satisfaction of a money judgment if (i) made after the date that is ninety days before the interposition of the claim on which such judgment was entered, or (ii) deemed to be fraudulent conveyances under article ten of the debtor and creditor law.

N.Y. CPLR § 5205(c).

agreement, and the individual defendants' guaranties each contain an exclusive forum-selection clause, choosing New York courts as the forum in which any disputes would be resolved, and a choice-of-law clause selecting New York law.  Each guaranty provides, for example, that "[t]his Guaranty shall be *governed by*, and construed in accordance with, the laws of the State of New York."  Compl., Ex. E (emphasis added); *see also id.*, Ex. A (note) ("This note shall be construed in accordance with and governed by the laws of the state of New York.  Maker irrevocably submits to the exclusive jurisdiction of the state and federal courts located in the state of New York to . . . settle any disputes, which may arise out of or in connection herewith and with the debt documents . . . ."); *id.*, Ex. B (Aircraft Security Agreement) ("This agreement and the rights and obligations of the parties hereunder shall in all respects be governed by and construed in accordance with, the internal laws of the state of New York, . . . regardless of the location of the aircraft.  Debtor irrevocably submits to the exclusive jurisdiction of the state and federal courts located in the state of New York to . . . settle any disputes . . . .").

This controversy arises under the guaranties and the note:  In its second cause of action, for "[b]reach of [g]uaranties," VFS sought a judgment in the amounts of "all amounts due under the [n]ote," then more than $2 million.  *Id.* at 8.  And in the parties' settlement, they agreed that judgment would be entered for VFS on, *inter alia*, the second cause of action.  *See, e.g.*, Dkt 38. The text of both the guaranties and the note reflected a choice of New York *substantive* law, not merely a decision to use New York choice-of-law rules.  *See, e.g.*, *IRB-Brasil Resseguros, S.A. v. Inepar Investments, S.A.*, 20 N.Y.3d 310, 313 (2012), *cert. denied sub nom. Inepar S.A. Industria e Construcoes v. IRB-Brasil Resseguros S.A.*, 133 S. Ct. 2396 (2013) (holding that New York substantive law applied where the parties' "Guarantee provided that it would be 'governed by,

and . . . be construed in accordance with, the laws of the State of New York.'"); *accord Philips Credit Corp. v. Regent Health Grp., Inc.*, 953 F. Supp. 482, 491 (S.D.N.Y. 1997).

The Court has independently analyzed whether the choice of New York substantive law was permissible, given that, other than the fact that their agreements provide for a New York forum, the parties and the underlying controversy appear to have little, if any, nexus to New York State. "New York choice-of-law rules . . . 'require[] the court to honor the parties' choice [of law provision] insofar as matters of substance are concerned, so long as fundamental policies of New York law are not thereby violated.'" *Bank of N.Y. v. Yugoimport*, 745 F.3d 599, 609 (2d Cir. 2014) (quoting *Woodling v. Garrett Corp.*, 813 F.2d 543, 551 (2d Cir. 1987)). Under those policies, a case may have so little connection to New York that it would be improper to apply New York law. *See Int'l Minerals & Res., S.A. v. Pappas*, 96 F.3d 586, 593 (2d Cir. 1996) ("[A]bsent fraud or violation of public policy, contractual selection of governing law is generally determinative so long as the State selected has sufficient contacts with the transaction.") (citation omitted). However, New York General Obligations Law § 5-1401(1) expressly permits parties with *no* relationship to New York to contractually choose New York law where their transaction involves at least $250,000. As the New York Court of Appeals has explained, the goal of the New York State legislature in enacting this law "was to promote and preserve New York's status as a commercial center and to maintain predictability for the parties"; accordingly, where the statute's requirements are met, courts are to apply New York substantive law rather than undertake an "interest analysis" assessing the relative interests of competing states. *Inepar Investments, S.A.*, 20 N.Y.3d at 314–16 ("[T]he parties' decision to apply New York law to their contract results in the application of New York substantive law, not New York's conflicts principles."). Because this turnover action, in which VFS seeks more than $600,000 in order to

11

vindicate a judgment of more than $2.4 million, clearly meets the statute's monetary requirement, the parties' choice of New York substantive law must be respected.

### C.    Analysis as to Fox's SRA/IRA Account

As reviewed above, N.Y. CPLR § 5205 protects an SRA/IRA retirement account against garnishment by creditors, save for money contributed to that account during, or after, the 90-day window preceding the creditor's lawsuit.  Whether that law applies here turns on two questions. First, does ERISA govern individual SRA/IRA accounts, such that an analysis as to possible federal preemption must be undertaken?  Second, if so, does ERISA preempt New York's anti-garnishment law from shielding that account from creditors?

### 1.    Does ERISA govern individual SRA/IRA accounts?

ERISA governs the *plans* under which SRA/IRA retirement accounts such as Fox's are created; Fox concedes this.  *See* Def. Sur-Reply, 2.  Fox, however, argues that individual SRA/IRA *accounts* such as his at Merrill Lynch fall outside the statute's scope, such that there is no basis to undertake an analysis of whether ERISA preempts state laws applicable to them. That claim may be quickly rejected.

ERISA is structured as follows.  "Title I of ERISA, 29 U.S.C. §§ 1001 *et seq.*, contains various substantive and procedural requirements with which covered plans must comply.  These include standards for vesting, funding and fiduciary responsibility . . . .  Title II of ERISA is codified in the Internal Revenue Code, 26 U.S.C. §§ 401 *et seq.*, and contains requirements pertaining to the qualification of pension plans for favorable tax treatment.  Title III, 29 U.S.C. §§ 1201 *et seq.*, contains ERISA's administrative and enforcement provisions.  Title IV, 29 U.S.C. §§ 1301 *et seq.*, establishes the Pension Benefit Guaranty Corporation ('PBGC'), which

guarantees the payment of benefits by plans which terminate with insufficient assets to pay those benefits." *Rose v. Long Island R.R. Pension Plan*, 828 F.2d 910, 913 (2d Cir. 1987).

ERISA clearly applies to SRA/IRA plans.  Subject to limited exceptions, ERISA applies to "any employee benefit plan," 29 U.S.C. § 1003, which the statute defines as "any plan, fund, or program . . . established or maintained by an employer or by an employee organization . . . to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program . . . provides retirement income to employees." *Id.* § 1002(2)(A).  This definition encompasses the SRA/IRA retirement plan established by Fox's employer.[2]  The parties agree on as much.  *See* Def. Sur-Reply, 2; Dkt. 55 ("Pl. Supp. Letter"), at 2.  And as noted, the U.S. Department of Labor ("DOL") lists SRA/IRA plans among the retirement plans that ERISA governs.  *See* U.S. Dep't of Labor, *Frequently Asked Questions About Retirement Plans and ERISA*.

As for Fox's claim that ERISA governs only the *plan*, not the *account* that the plan creates for the benefit of particular retirees, ERISA's text, which governs analysis of its reach, *see, e.g.*, *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999), refutes that claim.  In several places, ERISA sets out rules governing "simple retirement *accounts*."  Most notably, ERISA sets out in detail, what the "trustee of any simple retirement account [must] provide to

---

[2] That IRAs are excluded from portions of Title I—specifically, the participation and vesting provisions of *Part 2* of Title I, 29 U.S.C. §§ 1051–1061—does not change this result, because such plans, including SRA/IRA plans, are otherwise subject to Title I.  *See, e.g.*, *In re Taft*, 171 B.R. 497, 500–01 (Bankr. E.D.N.Y. 1994) ("SEP's [i.e., Simplified Employee Pension Individual Retirement Arrangements] are IRA's funded by employers . . . the TCC SEP is covered by ERISA, since it qualifies as an employee pension benefit plan or pension plan.") (internal quotation mark and citation omitted), *aff'd in part, rev'd in part on other grounds*, 184 B.R. 189 (E.D.N.Y. 1995).

the employer maintaining the arrangement each year."  29 U.S.C. § 1021(h)[3]; *see also id.* § 1104

(addressing when a plan participant assumes control of assets).[4]  These provisions cannot be

squared with the notion that ERISA coverage ends at the point an account is created pursuant to

a SRA/IRA plan.

Furthermore, DOL regulations confirm that SRA/IRA accounts are within ERISA's

scope.  DOL has ruled that *certain* types of "individual retirement account[s]" fall outside

ERISA's scope; the excluded IRAs, however, are limited to self-funded IRAs, *i.e.*, the accounts

---

[3] This subsection provides:

(h) Simple retirement accounts

(1) No employer reports: Except as provided in this subsection, no report shall be required under this section by an employer maintaining a qualified salary reduction arrangement under section 408(p) of title 26.

(2) Summary description: The trustee of any simple retirement account established pursuant to a qualified salary reduction arrangement under section 408(p) of title 26 shall provide to the employer maintaining the arrangement each year a description containing the following information:

(A) The name and address of the employer and the trustees.

(B) The requirements for eligibility for participation.

(C) The benefits provided with respect to the arrangement.

(D) The time and method of making elections with respect to the arrangement.

(E) The procedures for, and effects of, withdrawals (including rollovers) from the arrangement.

(3) Employee notification: The employer shall notify each employee immediately before the period for which an election described in section 408(p)(5)(C) of Title 26 may be made of the employee's opportunity to make such election.  Such notice shall include a copy of the description described in paragraph (2).

[4] This subsection provides:

(2) In the case of a simple retirement account established pursuant to a qualified salary reduction arrangement under section 408(p) of Title 26, a participant or beneficiary shall, for purposes of paragraph (1), be treated as exercising control over the assets in the account upon the earliest of—

(A) an affirmative election among investment options with respect to the initial investment of any contribution,

(B) a rollover to any other simple retirement account or individual retirement plan, or

(C) one year after the simple retirement account is established.

No reports, other than those required under section 1021(g) of this title, shall be required with respect to a simple retirement account established pursuant to such a qualified salary reduction arrangement.

*not* funded by an employer or employee association.  *See* 29 C.F.R. § 2510.3-2 (identifying

"specific plans, funds and programs which do not constitute employee pension benefit plans" for

purposes of title I of ERISA); *id.* § 2510.3-2(d)(i) (excluding IRAs only where, among other

things, "[n]o contributions [to the IRA] are made by the employer or employee association").

The Merrill Lynch SRA/IRA account falls outside the exclusion for self-funded IRAs, as

employer contributions are *mandatory* under the plan.  *See* Def. Sur-Reply, Ex. A at 5 ("the

Employer *shall make*" a matching contribution to the SRA/IRA for each plan year of up to 3% of

the participant's compensation, though the Employer can contribute smaller amounts in certain

years so long as it contributes certain specified amounts).

      Fox has cited no case—and the Court is aware of none—to hold that that ERISA applies

to SRA/IRA plans but not the accounts created pursuant to them.  On the contrary, courts have

repeatedly held that ERISA governs such SRA/IRAs, without ever distinguishing between

SRA/IRA plans and accounts.  *See, e.g.*, *McKinnon v. Doyle & Linda, Inc.*, 09 Civ. 0178 (CVE)

(TLW), 2009 WL 1619951, at *1 (N.D. Okla. June 9, 2009) ("Plaintiff was covered by an

ERISA-governed pension plan, known as a Simple IRA."); *Alfonso v. Tri-Star Search LLC*, 07

Civ. 1208 (ST), 2009 WL 1227769, at *3 (D. Or. May 4, 2009) ("[Defendant] sponsored an

ERISA-governed savings incentive match plan for small employers (SIMPLE) IRA Plan.");

*Altshuler v. Animal Hospitals, Ltd.*, 901 F. Supp. 2d 269, 278–79 (D. Mass. 2012) ("[Plaintiff]

does not dispute that [defendant]'s Simple IRA is an employee benefit plan under ERISA.");

*Simons v. Midwest Tel. Sales & Serv., Inc.*, 462 F. Supp. 2d 1004, 1006 (D. Minn. 2006) (holding

for employee, who participated in employer's SIMPLE IRA plan and had sued employer under

ERISA's anti-retaliation provision).  And for good reason:  The plan and the accounts created

under it are integrally interwoven.  Inasmuch as the plan under ERISA must address such matters

as the accounts' funding, the duties of account fiduciaries, and the account's entitlement to

contributions, it would be anomalous to treat an SRA/IRA account as outside the scope of federal

law, such that state law could operate freely upon the account with no concern about federal

preemption.  *Cf. Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon*, 541 U.S. 1, 16

(2004) ("Treating working owners as participants [in an ERISA-governed plan] also avoids the

anomaly that the same plan will be controlled by discrete regimes: federal-law governance for

the nonowner employees; state-law governance for the working owner.").[5]

In arguing that the SRA/IRA account is outside ERISA's scope, Fox relies on an IRS

guidance memorandum that states: "A SIMPLE IRA Plan is an individual retirement account

described in § 408(p)" of the Internal Revenue Code (IRC), while "[a] SIMPLE IRA is an

---

[5] The case law does draw a distinction in the area of IRAs, but not the one Fox suggests:  It holds that an *employer*-established account funded by employee *and* employer contributions, like an SRA/IRA or a Simplified Employee Pension Individual Retirement Arrangement (SEP IRA), is within ERISA's scope, whereas a traditional (or Roth) IRA, funded only by the *individual*, is outside of it.  *Compare McKinnon*, 2009 WL 1619951, at *1; *Alfonso*, 2009 WL 1227769, at *3; *Simons*, 462 F. Supp. 2d at 1006; *Lampkins v. Golden*, 28 F. App'x 409, 413 (6th Cir. 2002) (holding ERISA applicable to SEP IRA); *and Garratt v. Walker*, 164 F.3d 1249, 1251 (10th Cir. 1998) (en banc) ("[A] SEP is a pension plan within the meaning of ERISA."); *with Ducana Windows & Doors, Ltd. v. Sunrise Windows, Ltd., LLC*, 09 Civ. 12885 (VAR), 2013 WL 3287156, at *3 (E.D. Mich. June 28, 2013) (holding account exempt from garnishment pursuant to state law, rather than subject to levy pursuant to ERISA, because it "was a traditional IRA rather than a SEP IRA"); *Burns v. Delaware Charter Guar. & Trust Co.*, 805 F. Supp. 12, 20 (S.D.N.Y. June 8, 2011) (noting that traditional IRAs "are explicitly carved out of the scope of ERISA"); *Charles Schwab & Co. v. Debickero*, 593 F.3d 916, 919 (9th Cir. 2010) (holding that ERISA did not apply to employee-established IRA as to which "there was no employer oversight, no ongoing employer commitment, nor any potential for employer abuse"); *cf. In re Iacono*, 120 B.R. 691, 694 (Bankr. E.D.N.Y. 1990) (stating, *before* creation of the SRA/IRA in 1996, that IRAs "are not qualified pension plans which are governed by Title I of ERISA because they are created by an employee, not an employer"); *see also* IRS, *IRA-Based Plans* (explaining differences between IRAs, SRA/IRAs, and SEP-IRAs), available at http://www.irs.gov/Retirement-Plans/IRA-Based-Plans (last visited December 1, 2014). Notably, when ERISA was passed in 1974, the SRA/IRA did not exist; an IRA was solely employee-funded.  Congress created the SRA/IRA in 1996.  *See Small Business Job Protection Act of 1996*, Pub. L. No. 104-188, § 421, 110 Stat. 1792.

individual retirement account described in § 408(a)" of the IRC.  IRS Notice 98-4, *Simple IRA Plan Guidance*, Questions and Answers, A-1 and A-2.  But this document—in addition to having no legal force—does not support his thesis that ERISA applies only to the *plan*, not the *account*.

In sum, the statute's text, structure, and purpose, and its interpretation by the courts, all confirm that Fox's SRA/IRA account, and not merely the plan under which it came into being, is governed by ERISA.  The Court must, therefore, examine whether ERISA preempts N.Y. CPLR § 5205 from operating here.

### 2. Does ERISA preempt N.Y. CPLR § 5205 from sheltering Fox's SRA/IRA account from creditors?

ERISA does not itself protect the SRA/IRA account from creditors.  The statute does contain an "anti-alienation" provision that protects funds in other types of retirement accounts from creditors.  *See* 29 U.S.C. § 1056(d)(1) ("Each pension plan shall provide that benefits under the plan may not be assigned or alienated."); *see also United States v. Weiss*, 345 F.3d 49, 56 (2d Cir. 2003).  But the anti-alienation provision is part of Part 2 of Title I of ERISA, and ERISA excludes IRAs from *all* of Part 2 (which comprises 11 subsections).  *See* 29 U.S.C. § 1051(6) (Part 2 does not apply to "an individual retirement account or annuity described in section 408 of" the Internal Revenue Code).

At the same time, there is no ERISA provision that affirmatively makes an SRA/IRA retirement account reachable by creditors.  And the nature of the exclusion of SRA/IRAs from § 1056(d)(1) is such that it cannot fairly be said to embody an affirmative congressional judgment that such accounts ought to be accessible to creditors.  The exclusion of IRAs is not specific to that subsection (§ 1056(d)(1)).  Instead, an earlier subsection of the statute (29 U.S.C. § 1051(6)) globally excludes IRAs from *all* provisions in Part 2, of which § 1056(d)(1) is but one.

17

Because ERISA itself does not conclusively address whether an SRA/IRA account is exempt from the accountholder's creditors, the issue becomes one of preemption:  Does ERISA preempt New York's anti-garnishment law, N.Y. CPLR § 5205, from shielding such an account? The doctrine of federal preemption is grounded in the Supremacy Clause, U.S. Const. art. VI, cl. 2.  It holds that a state law that conflicts with a valid federal law is "without effect."  *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981).  Preemption may be express, implied, or both.  *See Williamson v. Mazda Motor of Am., Inc.*, 131 S. Ct. 1131, 1135–36 (2011).  Express preemption occurs when Congress explicitly preempts state law on a particular subject.  There are two broad types of implied preemption.  "Field" preemption arises when the federal regulatory scheme "is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it."  *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (2002) (citations omitted).  Conflict preemption, by contrast, arises where (1) "compliance with both federal and state regulations is a physical impossibility" or (2) the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Id.* (citations omitted).  Finally, "[i]n all pre-emption cases, and particularly in those in which Congress has 'legislated . . . in a field which the States have traditionally occupied,' . . . we 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'"  *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)).

ERISA's preemption clause, 29 U.S.C. § 1144(a), states that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan."  In its early decisions construing this provision, the Supreme Court emphasized the broad sweep of the phrase "relate to," terming it "deliberately expansive," *Pilot Life Ins. Co. v. Dedeaux*, 481

U.S. 41, 46 (1987), "broadly worded," *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 138 (1990), and "conspicuous for its breadth," *FMC Corp. v. Holliday,* 498 U.S. 52, 58 (1990); *see also Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 (1983) (noting that "the breadth of [ERISA's] pre-emptive reach is apparent from that section's language").  Based on this reading, the Court, in ERISA's early years, held ERISA broadly preemptive of state laws.  *See, e.g.*, *Ingersoll-Rand*, 498 U.S. at 140 (holding that ERISA preempted a Texas cause of action that "ma[d]e[] specific reference to, and indeed [wa]s premised on, the existence of a pension plan"); *Holliday*, 498 U.S. at 65 (holding that ERISA preempted a Pennsylvania law that precluded employee welfare benefit plans from exercising subrogation rights on a claimant's tort recovery); *Pilot Life*, 481 U.S. at 43, 54 (holding that ERISA preempted Mississippi "common law tort and contract actions asserting improper processing of a claim for benefits under an insured employee benefit plan" because ERISA already contained "a comprehensive civil enforcement scheme"); *Shaw*, 463 U.S. at 97 (holding that ERISA preempted New York's Human Rights Law and Disability Benefits Law, which—unlike ERISA—required payment of benefits to employees disabled by pregnancy); *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 524–25 (1981) (holding that ERISA preempted a New Jersey workers' compensation law that "intrude[d] indirectly" on the ERISA regime by "eliminat[ing] one method for calculating pension benefits—integration—that is permitted by federal law").[6]

In 1995, however, the Court adopted a narrower reading of ERISA's preemption clause, so as to re-focus the ERISA preemption inquiry on whether the state law at issue in fact

---

[6] Notwithstanding the Supreme Court's emphasis at that time on the preemption clause's breadth, the Court declined to find preemption where a case did not involve an ERISA-governed plan in the first place. *See Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 8 (1987).  In *Fort Halifax*, the Court distinguished between a "plan" and "benefits," noting that ERISA's preemption clause reaches only state laws that relate to employee benefit plans. *Id.*  Here, the parties agree that this case involves (at least) an ERISA-governed plan.

presented a functional conflict to the ERISA regime.  In a unanimous decision, the Court

recognized that, because at some level everything is arguably "related to" everything else,

construing ERISA's preemption clause as literally written would "read Congress's words of

limitation as mere sham, and . . . read the presumption against pre-emption out of the law

whenever Congress speaks to the matter with generality."  *N.Y. State Conference of Blue Cross

& Blue Shield Plans v. Travelers Ins.*, 514 U.S. 645, 656 (1995) ("*Travelers*").  Accordingly, the

Court reasoned, "[w]e simply must go beyond the unhelpful text and the frustrating difficulty of

defining [the preemption clause's] key term, and look instead to the objectives of the ERISA

statute as a guide to the scope of the state law that Congress understood would survive."  *Id.*

Consistent with the approach announced in *Travelers*, the Court since 1995 has applied

ERISA's preemption clause to sustain state regulations that might not have survived its earlier,

and more expansive, approach to ERISA preemption.  *See, e.g.*, *De Buono v. NYSA-ILA Med. &

Clinical Servs. Fund*, 520 U.S. 806, 809, 815 (1997) (ERISA does not preempt a New York law

that incidentally "impose[d] some burdens on the administration of ERISA plans" by imposing

"a gross receipts tax on the income of medical centers operated by ERISA funds"); *Cal. Div. of

Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 332 (1997)

(ERISA does not preempt California's prevailing wage laws and apprenticeship standards, even

though the apprenticeship program indirectly affects ERISA plans by "provid[ing] some measure

of economic incentive to comport with the State's requirements"); *Travelers*, 514 U.S. at 649,

668 (ERISA does not preempt state provisions—which imposed "surcharges on bills of patients

whose commercial insurance coverage is purchased by employee health-care plans governed by

ERISA"—even though these provisions had an indirect economic effect on choices made by

ERISA plans).  The Second Circuit, for its part, has emphasized the need to examine concretely

how the state law in question relates to ERISA's objectives.  *See, e.g.*, *Stevenson v. Bank of N.Y. Co.*, 609 F.3d 56, 59 (2d Cir. 2010) ("The 'relate to' language, however, is so expansive as a textual matter as to afford no meaningful limitation on the scope of ERISA preemption. Therefore, we look to the structure and objectives of the statute as a means of determining the scope of preemption."); *Hattem v. Schwarzenegger*, 449 F.3d 423, 428 (2d Cir. 2006) ("Although a plain reading of this statute lends itself to an extremely broad interpretation, the Supreme Court has greatly narrowed the scope of this section.").

In evaluating claims of preemption by ERISA, courts now "begin with the assumption that 'Congress does not intend to supplant state law,' a presumption that is particularly strong for 'state action in fields of traditional state regulation.'" *Gerosa v. Savasta & Co.*, 329 F.3d 317, 323 (2d Cir. 2003) (quoting *Travelers*, 514 U.S. at 654–55).  To find preemption of state law, a "'clear and manifest purpose' by Congress is required." *Liberty Mut. Ins. Co. v. Donegan*, 746 F.3d 497, 506 (2d Cir. 2014) (quoting *Travelers*, 514 U.S. at 655).  These principles inform both prongs of the test of ERISA preemption.  Specifically, a state law "relates to an employee benefit plan, within the meaning of 29 U.S.C. § 1144(a), if it has a 'connection with' or 'reference to' such a plan." *Hattem*, 449 F.3d at 428 (quoting *Travelers*, 514 U.S. at 656).  In deciding whether N.Y. CPLR § 5205 "relates to" ERISA so as to be preempted, the Court considers these prongs in turn.

### a.    Is there a "connection with" an employee benefit plan?

In evaluating whether a state law has an impermissible "connection with" an employee benefit plan, courts "look to the objectives of the ERISA statute as a guide." *Hattem*, 449 F.3d at 429.  The Supreme Court has identified two overarching goals of the statute: (1) "to protect . . . the interests of participants in employee benefit plans and their beneficiaries," 29 U.S.C.

§ 1001(b); *see also Boggs v. Boggs*, 520 U.S. 833, 845 (1997); *Shaw*, 463 U.S. at 90 ("ERISA is a comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans."); and (2) "to ensure that plans and plan sponsors would be subject to a uniform body of benefits law," *Travelers*, 514 U.S. at 656 (quoting *Ingersoll-Rand*, 498 U.S. at 142); *see also, e.g.*, *Boggs*, 520 U.S. at 836.

Under this approach, "state laws that would tend to control or supersede central ERISA functions—such as state laws affecting the determination of eligibility for benefits, amounts of benefits, or means of securing unpaid benefits—have typically been found to be preempted." *Gerosa*, 329 F.3d at 324. For example, ERISA has been held to preempt a state statute that "directly conflict[ed] with ERISA's requirements that plans be administered, and benefits be paid, in accordance with plan documents." *See Egelhoff v. Egelhoff*, 532 U.S. 141, 150 (2001); *see also Boggs*, 520 U.S. at 844 ("In the face of this direct clash between state law and the provisions and objectives of ERISA, the state law cannot stand."). The decisive question is therefore whether the state law at issue affects "core ERISA entities: beneficiaries, participants, administrators, employers, trustees and other fiduciaries, and the plan itself." *Gerosa*, 329 F.3d at 324. "Courts are reluctant to find that Congress intended to preempt state laws that do not affect the relationships among these groups." *Id.*

New York's anti-garnishment law does not implicate any of these concerns. A law that protects a retiree's SRA/IRA account from creditors does not interfere with the duties of ERISA plan administrators. It does not create disunity within federal law as to retirement benefits. And it does not affect the relationship between plan administrators and beneficiaries. *Cf. Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 15 (1987) ("[T]he Maine statute not only fails to implicate the concerns of ERISA's pre-emption provision, it fails to implicate the regulatory concerns of

ERISA itself."). The impact of the New York law instead falls on a non-ERISA entity, a third-party creditor: It prevents that creditor from garnishing and drawing down the beneficiary's retirement account. If anything, the New York statute thereby *furthers* ERISA's broad goal of ensuring the security of retirement income of future retirees, by giving retirement accounts a degree of protection above and beyond that provided in ERISA. *See Boggs*, 520 U.S. at 845.

The nature of the modern ERISA preemption inquiry thus appears decisive in this case. Under the Supreme Court's pre-1995 approach to ERISA preemption, essentially a capacious version of field preemption, N.Y. CPLR § 5205 might well have been preempted, because the statute literally "relates to" an ERISA plan, insofar as Fox's account was created pursuant to such a plan. But under the modern, functional test of ERISA preemption, which asks whether a state law conflicts with ERISA's program or objectives, it is hard to find any such conflict. Simply put, there is no ERISA goal, relationship, or provision with which N.Y. CPLR § 5205 can be said to conflict. As noted, Congress's global exemption of IRAs from all of Part 2 of Title I of ERISA did not codify a federal policy to the effect that creditors should automatically be free to reach such accounts. *Cf. Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 836 (1988) ("Where Congress intended in ERISA to preclude a particular method of state-law enforcement of judgments, or extend anti-alienation protection to a particular type of ERISA plan, it did so expressly in the statute.").

The Supreme Court's 2001 decision in *Egelhoff* provides a useful illustration of a state law that is preempted by ERISA—and a revealing contrast to the law at issue here. In *Egelhoff*, the Court held that a state law was preempted on account of "an impermissible connection with ERISA plans," because it bound "ERISA plan administrators to a particular choice of rules for determining beneficiary status," under which they "must pay benefits to the beneficiaries chosen

23

by state law, rather than to those identified in the plan documents." 532 U.S. at 147. The state statute thus "implicate[d] an area of core ERISA concern." *Id.* The statute thus was a far cry from "generally applicable laws regulating 'areas where ERISA has nothing to say,' which we have upheld notwithstanding their incidental effect on ERISA plans." *Id.* at 147–48 (quoting *Dillingham*, 519 U.S. at 330).

In contrast, N.Y. CPLR § 5205 is both a "generally applicable" law and one that, rather than bearing on plan administration, operates in an area—debtor/creditor relations—"where ERISA has nothing to say." *Id.* at 148. It is akin to the state laws, including laws that taxed or surcharged accounts governed by ERISA, which the Supreme Court and Second Circuit have upheld against claims of preemption, on the grounds that such laws had only an incidental or indirect effect on retirement accounts. *See, e.g.*, *Travelers*, 514 U.S. at 649, 668 (ERISA does not preempt state-law provisions—which imposed "surcharges on bills of patients whose commercial insurance coverage is purchased by employee health-care plans governed by ERISA"—even though these provisions had an indirect economic effect on choices made by ERISA plans); *De Buono*, 520 U.S. at 815 (ERISA does not preempt a New York law that incidentally "impose[d] some burdens on the administration of ERISA plans" by imposing "a gross receipts tax on the income of medical centers operated by ERISA funds"); *Hattem*, 449 F.3d at 431–32 (ERISA does not preempt a state law partly because "although this law may have an indirect effect on choices, it does not force trust fiduciaries to act in a certain manner").

In claiming preemption, VFS largely ignores this body of authority. It instead casts the statutory exemption for IRAs as bespeaking an affirmative decision by Congress that creditors should be able to reach IRAs. But the statutory structure undermines this notion. IRAs are broadly exempted from all of Part 2 of Title I, *see* 29 U.S.C. § 1051(6), in a global exclusion that

precedes the anti-alienation provision, § 1056(d)(1).  *See Boggs*, 520 U.S. at 851 ("ERISA's

pension plan anti-alienation provision is mandatory and contains only two explicit exceptions,

see §§ 1056(d)(2), (d)(3)(A), which are not subject to judicial expansion.").  VFS does not point

to any evidence that Congress intended to enact a specific federal policy *in favor of* creditors as

opposed to retirees with respect to such assets.  Instead, the broad exclusion of IRAs from Part 2

appears to reflect the judgment that excluding such accounts from the array of requirements

there—which include participation and vesting rules—would make it easier to administer IRAs.

*See* Alson R. Martin, *Creditors' and Debtors' Rights in Retirement Benefits: Developments after*

*the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005*, SM047 ALI-ABA 309,

413 (2006) ("The participation and vesting rules of Title I of ERISA do not apply to any plan

established under §408.  Thus, a §408[] plan agreement is not required to provide that benefits

under the plan may not be assigned or alienated, while most other ERISA pension benefit plans

must due to the 'anti-alienation' provision of 29 U.S.C. §1056(d)(1).  Nothing in ERISA

prohibits a state from protecting the benefits of participants who utilize Code Section 408 to fund

their retirements.").

     Analyzing the statute from a different perspective, one may view ERISA as creating three

distinct legal regimes with respect to the ability of a creditor to garnish a beneficiary's retirement

account.  The first legal regime involves accounts subject to ERISA's anti-alienation clause, 29

U.S.C. § 1056(d)(1), including employer-maintained accounts such as 401-Ks.  ERISA's anti-

alienation clause reflects an affirmative congressional policy judgment generally to protect these

accounts from creditors.  The second legal regime arises from the two discrete exceptions to that

clause.  These appear in ERISA immediately after that clause.  They provide for the alienability

of such accounts to effectuate (1) pre-ERISA transactions, 29 U.S.C. § 1056(d)(2), and (2) a

"qualified domestic relations order," such as a judgment directing the payment of child support or alimony, *id.* § (d)(3).  The statute's provision for these limited circumstances reflects an affirmative congressional policy judgment *not* to protect these accounts from such creditors. These are the only "explicit exceptions" to the anti-alienation clause.  *Boggs*, 520 U.S. at 851. There is obvious equitable logic to Congress's express decision to permit the interests of these creditors to trump the interest of the account beneficiary.  The third legal regime is the one at issue in this case.  It involves IRA accounts such as SRA/IRAs.  These are excluded from the anti-alienation clause, not by a specific exception to that provision, but by virtue of the wholesale exclusion of these accounts from all of Part 2 of Title I.  In the Court's judgment, this exclusion—unlike the specific exemptions for pre-ERISA transactions and domestic relations creditors—does not bespeak an affirmative congressional policy to systematically prefer judgment creditors over retirees with respect to these accounts.  Put differently, although Congress did not itself act to shield these accounts from judgment creditors, it also did not act to block states from doing so.  It was silent on the subject.  Through its silence, Congress left state law free to operate.

In so holding, the Court recognizes that there is limited case law in this area.  There appears to be just one case calling into question a state statute that, like N.Y. CPLR § 5205, protects SRA/IRA accounts from creditors.[7]  In its unpublished decision in *Lampkins v. Golden*, 28 F. App'x 409 (6th Cir. 2002), the Sixth Circuit held that a judgment creditor could garnish a

---

[7] Many other states also protect (in whole or large part) such accounts from judgment creditors. *See, e.g.*, Conn. Gen. Stat. § 52-321a; 735 Ill. Comp. Stat. Ann. 5/12-1006; Kan. Stat. Ann. § 60–2308; La. Rev. Stat. Ann. §§ 13:3881, 20:33; Mich. Comp. Laws Ann. § 600.6023(1); Neb. Rev. St. § 25-1563.01; N.J. Stat. Ann. § 25:2–1; Tex. Prop. Code Ann. § 42.0021(a); Ariz. Rev. St. Ann. § 33–1126(B); *see generally* Marjorie A. Shields, *Individual Retirement Accounts As Exempt from Money Judgments in State Courts*, 113 A.L.R. 5th 487 (2003).

judgment debtor's SEP IRA, because ERISA preempted a Michigan law that otherwise protected the debtor's assets from garnishment.  *Id.* at 414–15.

Lampkins, however, is of dubious vitality.  The Sixth Circuit did not mention *Travelers*, or acknowledge the Supreme Court's post-1995 approach to ERISA preemption; it instead relied solely on pre-1995 case law, did not mention the presumption against preemption, and did not inquire whether the Michigan statute impaired ERISA's objectives and practical operation. *Compare Travelers*, 514 U.S. at 655–56 (rejecting "uncritical literalism" underlying pre-1995 ERISA preemption doctrine); *Dillingham*, 519 U.S. at 325; *De Buono*, 520 U.S. at 813–14.  The Sixth Circuit also did not address the cases upholding state laws of general applicability (like Michigan's) that presented no more than incidental burdens to the ERISA regime.  *See, e.g.*, *Travelers*, 514 U.S. at 668; *De Buono*, 520 U.S. at 809; *Hattem*, 449 F.3d at 431–32.  The Sixth Circuit instead reasoned simply that ERISA, by not precluding garnishment, permitted it, and thus preempted state anti-garnishment laws.  *Lampkins*, 28 F. App'x at 415.  For the reasons set out above, the Court is unpersuaded by this reasoning.[8]

### b.       Is there a "reference to" an employee benefit plan?

Applying the alternative "reference to" prong of the ERISA preemption test, the Supreme Court has preempted a law that "impos[ed] requirements by reference to [ERISA] covered programs," *District of Columbia v. Greater Washington Board of Trade*, 506 U.S. 125, 130–31

---

[8] In a 1992 decision cited by neither party, a court in this district held that ERISA preempted part of New York's anti-garnishment statute (N.Y. CPLR § 5205(c)(5)) as it applied to pension plans. *See FDIC v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, M-18-302 (KMW), 1992 WL 204380, at *1 (S.D.N.Y. Aug. 11, 1992) ("The Federal Deposit Insurance Corporation (FDIC) moves to garnish and execute upon certain funds deposited in a pension plan of Judgment–Debtor Morris A. Wirth.") ("*Merrill*").  *Merrill*, however, is easily distinguished.  Unlike IRAs, pension plans are covered by ERISA's anti-alienation clause, and the court logically emphasized the "strength of [ERISA's] anti-alienation provision" in finding preemption of state anti-garnishment law as to such plans.  And insofar as the *Merrill* court was moved by "the breadth of federal preemption in ERISA," *id.* at *2, the decision there predated the 1995 change in ERISA preemption doctrine.

(1992); a law that "specifically exempted ERISA plans from an otherwise generally applicable garnishment provision," *Mackey*, 486 U.S. at 828 n.2; "and a common-law cause of action premised on the existence of an ERISA plan," *Ingersoll-Rand,* 498 U.S. at 140.  *Dillingham*, 519 U.S. at 324–25.  The Supreme Court has synthesized these rulings as follows:  "Where a State's law acts immediately and exclusively upon ERISA plans, as in *Mackey,* or where the existence of ERISA plans is essential to the law's operation, as in *Greater Washington Bd. of Trade* and *Ingersoll-Rand,* that 'reference' will result in pre-emption."  *Id.* at 325.

Measured against these standards, N.Y. CPLR § 5205 is not preempted.  First, the New York law does not act "immediately and exclusively upon ERISA plans."  *Id.*  It blocks creditors from reaching a wide range of assets, including, among others, religious texts, family pictures, domestic animals, a wedding ring, clothing, a car, and—relevant here—retirement funds provided for under IRC § 408.  N.Y. CPLR § 5205(a), (c).  Such retirement funds are not, therefore, the exclusive focus of New York's statute, unlike the Georgia law struck down in *Mackey*, which explicitly referred—and solely applied—to ERISA plan benefits.  *See* 486 U.S. at 828 & n.2.[9]  Indeed, even if retirement plans provided for under IRC § 408 were the sole subject of New York's anti-garnishment statute, the statute would reach far more than ERISA plans. That is because many types of IRAs created pursuant to IRC § 408, including traditional IRAs, are outside the scope of ERISA.

The "existence of ERISA plans" is also not "essential to the [state] law's operation."  To be sure, § 408 of the IRC was originally passed as part of ERISA in 1974.  *See Rose*, 828 F.2d at

_____

[9] The Georgia statute provided that:  "Funds or benefits of a pension, retirement, or employee benefit plan or program subject to the provisions of the federal Employee Retirement Income Security Act of 1974, as amended, shall not be subject to the process of garnishment . . . unless such garnishment is based upon a judgment for alimony or for child support."  *See id.* (quoting Ga. Code Ann. § 18–4–22.1)).

913.  But, the Supreme Court's decision in *Ingersoll-Rand* does not "categorical[ly] bar[] state causes of action that might overlap with ERISA";  rather, as the Second Circuit has explained, *Ingersoll-Rand* is merely an application of the principle that modern ERISA preemption "depends on whether state remedies are consistent with *ERISA's core purposes.*"  *Gerosa*, 329 F.3d at 325 (emphasis added).  Here, as noted, they are.  Further, as the Second Circuit has observed, "[w]hile singling out ERISA plans for special treatment is considered a 'reference,' simply mentioning the word 'ERISA' is not."  *Hattem*, 449 F.3d at 432 (citing *New Eng. Health Care Emps. Union v. Mount Sinai Hosp.*, 65 F.3d 1024, 1032 (2d Cir. 1995)).  New York's anti-garnishment law does not single out ERISA plans for special treatment; instead, it sets out a list of non-garnishable items, from clothing to books to pets.  Indeed, in a case involving a claim of ERISA preemption based on the "reference to" prong, the Supreme Court emphasized that "state-law methods for collecting money judgments must, as a general matter, remain undisturbed by ERISA."  *Mackey*, 486 U.S. at 834; *see also* Fed. R. Civ. P. 69(a).  New York's law is such a state-law method.

For these reasons, application of New York's anti-garnishment statute to Fox's SRA/IRA account is not preempted by ERISA.  As a result, VFS is not entitled to a turnover order with respect to Fox's entire SRA/IRA.

### 3.    Statutory Exception for Recent Contributions

New York CPLR 5205(c) does not, however, protect *all* funds in an SRA/IRA account from garnishment.  Under the anti-garnishment statute, "any contributions to [the debtor's SRA/IRA] account made after the date that is 90 days before the interposition of the claim on which the judgment herein was entered are not exempt from execution."  *Bellco Drug Corp. v. Bear Stearns & Co.*, No. 31021/98, 1999 WL 399903, at *2 (N.Y. Co. Ct. Apr. 12, 1999); *see*

*also FDIC v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, M-18-302 (KMW), 1992 WL 204380, at *1 (S.D.N.Y. Aug. 11, 1992) ("CPLR 5205(c)(2) *exempts* from execution certain qualified pension plans . . . . However, CPLR 5205(c)(5) creates an exception to the exemption: creditors are entitled to execute on additions made to the pension fund *after* a date ninety days before the judgment creditor initially interposed its claim."); *Memmo v. Perez*, 63 A.D.3d 472, 472–73 (N.Y. App. Div. 2009).

In other words, in the event that Fox or his employer made contributions to that account after January 12, 2012 (90 days prior to VFS's filing of this lawsuit on April 11, 2012, *see* Dkt. 1), VFS would be entitled to a turnover order with respect to such funds. The parties have not briefed whether Fox and/or his employer made any contributions to his SRA/IRA account after that date. The parties are directed to promptly confer on this issue. VFS is directed to submit to the Court, within two weeks of this order, a letter stating whether there were any such contributions; if so, whether the parties agree on the amount of such contributions; and/or whether VFS (or Fox) seeks discovery as to this issue. Upon receipt of that letter, the Court will determine whether a final order may issue with respect to the disposition of funds in Fox's SRA/IRA account, and/or whether discovery into these matters is to proceed.

### D.    Analysis as to Fox's CMA Account

For the reasons reviewed earlier, New York law applies to this controversy. And under New York law, Fox has no basis to withhold from VFS the CMA account he and his wife share. That is because New York law does not recognize tenancies by the entirety for personal property, including bank accounts. *See Mendelovici v. Integrity Life Ins. Co.*, 872 N.Y.S.2d 647, 652–53 (N.Y. Sup. Ct. 2009) ("It is well settled in New York that when real property is conveyed to a husband and wife who are lawfully married to each other at the time of the conveyance, they . . .

take . . . as tenants by the entirety . . . .  The same is not true for personal property. '[T]here can be no holding by the entirety in personalty.'" (quoting *Hawthorne v. Hawthorne*, 13 N.Y. 2d 82, 83 (1963))).  And "jointly owned assets [such as the CMA] are vulnerable to levy by a judgment creditor." *Signature Bank v. HSBC Bank USA, N.A.*, 67 A.D.3d 917, 918 (N.Y. App. Div. 2009).

Concretely, under New York law, a joint account "creates a rebuttable presumption that each named tenant is possessed of the whole of the account so as to make the account vulnerable to levy of a money judgment by the judgment creditor of one of the joint tenants." *Id.* (quoting *Tayar v. Tayar*, 208 A.D.2d 609, 610 (N.Y. App. Div. 1994)).  The judgment debtor bears the burden of rebutting that presumption. *Tayar*, 208 A.D.2d at 610.  The presumption can be rebutted "'by providing direct proof that no joint tenancy was intended or substantial circumstantial proof that the joint account had been opened for convenience only.'" *Signature Bank*, 67 A.D.3d at 918 (quoting *Fragetti v. Fragetti*, 262 A.D.2d 527, 527 (N.Y. App. Div. 1999)).  "If the presumption is rebutted, the judgment creditor's levy on the jointly owned bank account is effective only up to the actual interest of the judgment debtor in the account." *Id.* However, Fox, the judgment debtor here, has not met that burden, or, indeed, attempted to do so. Accordingly, VFS is entitled to a turnover order with respect to the full CMA account.

## CONCLUSION

For the foregoing reasons, VFS is entitled to a turnover order with respect to Fox's cash management account at Merrill Lynch.  However, VFS is not entitled to a turnover order for Fox's SRA/IRA retirement account, except insofar as contributions were made into that account after January 12, 2012, 90 days before this lawsuit was filed.  VFS is directed to confer promptly with counsel for Fox, and to inform the Court, by letter due within two weeks of this decision, whether the parties agree on the amount of any such contributions to the SRA/IRA retirement

account; and/or whether it, Fox, or both parties seek discovery on this point. The Clerk of Court

is respectfully directed to terminate the motion pending at docket number 39.

SO ORDERED.

Paul A. Engelmayer

PAUL A. ENGELMAYER
United States District Judge

Dated: December 1, 2014
       New York, New York

32